UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINIOS
EASTERN DIVISION

| | |
|---|---|
| *In Re: Rough Rice Commodity Litigation* | No. 11 CV 00618 |
| This Document Relates To: | Judge John W. Darrah |
| All Actions | Magistrate Judge Finnegan |

## CONSOLIDATED CLASS ACTION COMPLAINT

Plaintiffs Gregory Galan and Jeffrey Laydon, (collectively, "Plaintiffs") complain of Defendants, upon knowledge as to themselves and their own acts and upon information[1] and belief as to all other matters, as follows:

## NATURE OF ACTION

1. (a) Between at least October 1, 2007 and July 31, 2008 ("Class Period"), Defendants (as defined in ¶¶15-19 below) repeatedly injected unlawful trades and positions into the supply-demand equation for prices of rough rice futures and option contracts traded on the Chicago Board of Trade ("CBOT").

(b) For example, during the Class Period, Defendants Daniels, Taylor and DTG violated—**at least eighty-three times**—various CBOT rules limiting the size of the position that could lawfully be held ("position limits"). See CFTC Order (see fn. 1) p. 3.

---

[1] Plaintiffs' information includes: (a) *In re: Andrew W. Daniels, Edward L. Taylor, Glenn A. Swanson, Global Asset Advisors LLC d/b/a Daniels Trading, and Daniels Trading Group LLC*, CFTC Docket No. 11-05, Order Instituting Proceedings Pursuant to Sections 6(c) and 6(d) of the Commodity Exchange Act, Making Findings And Imposing Remedial Sanctions, dated January 26, 2011 ("CFTC Order"); (b) data concerning Chicago Board of Trade ("CBOT") rough rice futures contract prices, volume and open interest; (c) Commodity Futures Trading Commission ("CFTC") Commitment of Traders Reports; (d) CBOT rules; and (e) other publicly available information or price information.

(c) The primary purpose of position limit rules is to prevent price manipulation. Trades and positions that exceed position limit rules inject unlawful pressure into the supply-demand equation for prices.  Defendants' eighty-three position limit violations during the ten month Class Period repeatedly injected unlawful pressure into the equation for the prices of rough rice futures and options traded in this District on the CBOT.

(d) The CFTC Order is a negotiated document pursuant to which Defendants Daniels, Taylor and DTG agreed to pay a $2,000,000 civil monetary penalty for their position limit violations and, in effect, thereby avoided being charged with price manipulation.  See fn. 1. Also, the CFTC banned Defendant Taylor from trading any futures or options contracts for eleven months and banned Defendants Daniels and DTG from trading rough rice futures or options for eleven months.

(e) Defendants Global and Swanson agreed to pay a $200,000 penalty to the CFTC for their violations of the most basic duties of a broker.  These duties were to supervise employees and ensure that only persons who are listed as the owner of an account place trades for that account (absent written permission or a power of attorney).

(f) The CFTC further found that Defendants Global and Swanson failed to supervise their employees who allowed one person (Defendant Taylor) to put in a trade for the account of another person (Defendant Daniels) when there was no permission (*e.g.*, power of attorney) to do so.

(g) The most fundamental requirement of a broker is to safeguard each account entrusted to the broker.  Defendants Global and Swanson would not have allowed such placement by one person of trades in the account of another person unless Defendants Global

and Swanson had very good reason to know that such persons were working together or acting jointly.

(h) The fact that persons are working together or jointly requires that their positions be aggregated together and counted as one for position limit purposes. It is a reasonable inference and Plaintiffs do allege that Defendants Global and Swanson had good grounds to know that Defendants Taylor, Daniels, and DTG were working together or working jointly and were required to be aggregated as one for purposes of the position limits.

(i) With such knowledge, Defendants Global and Swanson engaged in the highly unusual conduct of violating the most basic duties of a broker. Such knowing violations occurred on an ongoing basis for ten months and provided material assistance to Defendants Daniels, Taylor and DTG, which enabled them to repeatedly inject unlawful trade and position pressure into the supply-demand equation for prices of CBOT rough rice futures and options contracts to the extent of the position limit violations.

(j) Thus, the CFTC ordered Defendants Global and Swanson to take specific steps to institute the most basic compliance procedures to supervise their employees and, in effect, avoid in the future a repetition of providing material assistance to persons who were violating the position limits.

2. According to the Commodity Exchange Act, 7 U.S.C. §1 *et seq.* ("CEA"), position limits are specifically designed to "…reduce the potential threat of market manipulation or congestion…" See 7 U.S.C. §7(d)(5).

3. The repeated intentional violations of CBOT position limits by Defendants Daniels, Taylor and DTG were unlawful and were not a legitimate part of the supply-demand equation for the prices of the CBOT rough rice futures contracts. Therefore, the resulting prices

3

of CBOT rough rice futures and option contracts were **necessarily** artificial by at least the amount of price impact caused by the unlawful portion of such Defendants' trades and positions. See ¶¶40-42 *infra*.

4. (a) Defendants' unlawful positions not only exceeded the CBOT position limits imposed to prevent manipulation. Defendants' unlawful positions also a constituted a large percentage of the open interest in CBOT rough rice futures contracts during the Class Period. This includes 75.8% of the open interest in the July 2008 rough rice futures contract on July 10, 2008. See ¶53 *infra*.

(b) The resulting prices of the July 2008 rough rice futures contract were necessarily caused to be artificial by these injections of large amounts of unlawful trades and positions into the price equation for July contracts.

(c) Separately, Defendants' repeated trades moved prices to artificial levels, twisted artificially the relationships between and among prices, caused artificial and excessive fluctuations in prices, and caused artificial deviation in the futures prices compared to the cash market prices. See, *e.g.*, ¶54 *infra*. All these changes necessarily meant that prices of CBOT rough rice futures and option contracts were artificial during the Class Period.

5. (a) Until discovery, Plaintiffs lack information about Defendants' percentage of the open interest on days of the Class Period other than July 8, 9 and 10, 2008. Such information is within Defendants' control and not available to Plaintiffs.

(b) However, the CBOT rough rice futures contract was a lightly used low volume trading contract that was susceptible to manipulation by large positions and large trades.

(c) For these and other reasons, Plaintiffs have good grounds to believe and do allege that yet other volatile movements of rough rice futures prices and other deviations from the norm for these prices were caused by Defendants during the Class Period. See ¶54 *infra*.

6.   Further confirming their manipulative intent, Defendants Taylor, Daniels, and DTG took numerous affirmative steps in order to conceal from the CBOT such Defendants' injection of unlawful trades and positions into the supply-demand equation for prices. These steps were themselves separate violations of the CEA. See Section 9(a)(4) of the CEA, 7 U.S.C. §13(a)(4).

7.   Such Defendants' foregoing fraud on the CBOT combined with their repeated (83) violations of the CBOT's position limits compels a strong inference of such Defendants' intent to manipulate CBOT rough rice futures and option contract prices.

8. (a) As a result of the foregoing, Defendants Daniels, Taylor and DTG violated Section 9(a) of the CEA, 7 U.S.C. §13b, which prohibits the manipulation of commodity futures contract or options prices.

(b) Defendants Global and Swanson knew that Defendants DTG, Daniels and Taylor ("the Manipulator Defendants") were acting together or acting jointly; knew the Manipulator Defendants' large positions were violating the position limits; knew that the position limits were primarily intended to prevent manipulation; knew that the rough rice futures market was a thin market; knew that the Manipulator Defendants had even developed dominant positions in various CBOT rough rice futures contracts; and also knew that dominance is a further indication of price manipulation.

(c) Yet, with such knowledge, Defendants Global and Swanson repeatedly and continuously provided highly unusual assistance to the Manipulator Defendants. Such assistance

5

permitted the Manipulator Defendants, eighty-three times during the Class Period, to violate

CBOT position limits and inject unlawful and illegitimate trades and positions into the thin and

illiquid rough rice futures contract's supply/demand equation that determined its prices.

Thereby, Defendants Global and Swanson aided and abetted the manipulation.

9. Defendants' manipulation in violation of the CEA proximately caused Plaintiffs

and members of the Class to pay artificial prices for CBOT rough rice futures and option

contracts during the Class Period and to suffer other legal injury including being deprived of a

lawfully operating market. For these injuries proximately caused by Defendants' manipulation

and aiding and abetting of manipulation, Plaintiffs and class members are entitled to recover

their actual damages resulting therefrom.

## JURISDICTION AND VENUE

10. Rough rice is a "commodity" and is the "commodity underlying" CBOT rough

rice futures and option contracts traded on the CBOT, as those terms are defined and used in

Section 1a(4) and 22 of the CEA, 7 U.S.C. §§1a(4) and 25(a)(1)(D), respectively.

11. This Court has jurisdiction over this action pursuant to Section 22 of the CEA, 7

U.S.C. §25, 28 U.S.C. §§1331 and 1337.

12. Venue is proper in the Northern District of Illinois pursuant to Section 22 of the

CEA, 7 U.S.C. §25(c), 28 U.S.C. §1391(b) and (c). The Defendants maintain offices in the

Northern District of Illinois, transacted business in the Northern District of Illinois, the claims

arose in the Northern District of Illinois, and a substantial part of the events or omissions giving

rise to the claims occurred in the Northern District of Illinois.

13. The Chicago Board of Trade is located in this District at 141 West Jackson

Boulevard, Chicago, Illinois, 60604. Defendants' unlawful acts manipulated the prices of CBOT

rough rice futures and option contracts which are traded in this District on the CBOT. The CBOT became a wholly-owned subsidiary of the CME Group Inc. ("CME") in or around July 2007.

## PARTIES

### Plaintiff

14. (a) Plaintiff Gregory Galan is a resident of Garfield Heights, Ohio. Plaintiff Galan engaged in two transactions in CBOT rough rice futures contracts during the Class Period. First, on November 30, 2007, Plaintiff Galan sold three January 2008 CBOT rough rice futures contracts at $12.87 per hundredweight. On December 7, 2007, Plaintiff Galan paid $13.32 per hundredweight to purchase three January 2008 CBOT rough rice futures contracts. Plaintiff Galan lost $2,700 on the foregoing transaction. Second, on March 20, 2008, Plaintiff Galan sold one May 2008 rough rice futures contract at $17.835 per hundredweight. On April 15, 2008, Plaintiff Galan paid $22.16 per hundredweight to purchase one May 2008 CBOT rough rice futures contract. Plaintiff Galan lost $8,660 on the foregoing transaction. Plaintiff Galan transacted at artificial prices in a manipulated market, was deprived of transacting in a lawful and non-manipulative market, and otherwise suffered legal injury as a direct result of Defendants' manipulation. Plaintiff Galan is entitled to recover his actual damages proximately caused by Defendants' unlawful manipulation.

(b) Plaintiff Jeffrey Laydon, a natural person residing in Sanford, Florida, traded CBOT rice option contracts at artificial prices in a manipulated market during the Class Period. On October 11, 2007, Plaintiff Laydon purchased ten January 2008 CBOT rough rice put options with a strike price of $10.80 per hundredweight. Those options expired worthless on December 21, 2007. Plaintiff Laydon lost $1,000 on the foregoing transaction. Plaintiff Laydon transacted

at artificial prices in a manipulated market, was deprived of transacting in a lawful and non-manipulative market, and otherwise suffered legal injury as a direct result of Defendants' manipulation. Plaintiff Laydon is entitled to recover his actual damages proximately caused by Defendants' unlawful manipulation.

**Defendants**

15. Andrew W. Daniels ("Daniels") is a resident of Illinois. Daniels is the founder, Chief Executive Officer and a registered associated person of Defendant Global Asset Advisors LLC d/b/a Daniels Trading and a registered introducing broker. Daniels is a Manager of Defendant Daniels Trading Group LLC.

16. Edward L. Taylor ("Taylor") is a resident of Illinois. Taylor is not registered with the CFTC in any capacity. Taylor has a membership interest of 0.02% in Defendant Daniels Trading Group LLC and is authorized to trade accounts in the name of Defendant Daniels Trading Group LLC.

17. Glenn A. Swanson ("Swanson") is a resident of Illinois. Swanson is the President and a registered associated person of Defendant Global Asset Advisors LLC d/b/a Daniels Trading and is the Chief Operating Officer and a Manager of Defendant Daniels Trading Group LLC.

18. Global Asset Advisors LLC d/b/a Daniels Trading ("Global") is a limited liability corporation organized under the laws of Illinois and is located in Chicago, Illinois.

19. Daniels Trading Group LLC ("DTG") is an unregistered trading company organized under the laws of Illinois and is located in Chicago, Illinois.

## BACKGROUND

### A.     Commodity Futures Exchanges and Options

20. A person may act as a futures contract exchange or board of trade only if that person is approved and designated to do so by the CFTC. The CFTC approves such a designation only if the proposed exchange sufficiently demonstrates (a) that it has rules, such as position limit rules, to prevent price manipulation, and (b) that it has procedures to enforce such anti-manipulation rules.

21. The CBOT is designated by the CFTC as a board of trade. The CBOT applies to the CFTC for permission to trade each commodity in which the CBOT offers a contract. The CBOT must establish, among other things, that the proposed contract is not prone to price manipulation, including because of sufficient position limits, in order to win approval to trade such contract. CBOT members and clearing members have to follow the rules of the CBOT. This includes the most important rules, the rules prohibiting manipulation.

22. Also, commodity futures professionals licensed as associated persons are required to be familiar with CFTC and exchange requirements. This includes the most important requirements, those prohibiting price manipulation.

## B.    Commodity Futures Contracts

23. A commodity futures contract is a standardized bilateral executory agreement for the purchase and sale of a particular commodity. See *Leist v. Simplot*, 638 F.2d 283, 322 (2d Cir. 1980) (Friendly, J.) ("*Leist*") *aff'd, Merrill Lynch Fenner & Smith v. Curran*, 456 U.S. 353, 384-85 (1982). In the context of futures trading, a commodity is the underlying instrument upon which a futures contract is based.

24. The "bilateral" aspect of the futures contract is that there is a seller and buyer. *Leist*, 638 F.2d at 322.

9

25. The sellers are one-half of the bilateral futures contract and one-half of the commodity futures market. *Id.* They are referred to as "shorts." *Id.*

26. The buyers are the other one-half, and are referred to as "longs." *Id.*

27. One of the many differences between stock and commodity futures trading is that the commodity exchange (here, the CBOT) publishes the amount of the open interest of "longs" and "shorts" at the end of each trading day.

28. Open interest is defined as the total number of futures contracts in a delivery month or market that has been entered into and not yet offset or cancelled. Each open transaction has a buyer (a long) and a seller (a short).

29. All things equal, buying pressure in a commodity futures contract will increase prices and selling pressure will decrease prices.

30. (a) Because the CBOT futures prices are publicly reported, the increased or decreased prices resulting from buying pressure or selling pressure may encourage others to act accordingly.

(b) An option contract on a future is a contract that gives the owner of the option the right, but not the obligation, to be long or short a futures contract at a specified price within a specified time period. The specified price is called the strike price. The futures contract that the owner of a call option or a put option may establish by exercising the option is referred to as the underlying futures contract. An option buyer is one who purchases an option and pays a premium. An option seller is one who sells an option and receives a premium. Premiums are arrived at through open competition between buyers and sellers on the CBOT. A put option is the option to sell a futures contract, and a call option is the option to buy a futures contract. At all relevant times during the Class Period, options on CBOT rice futures contracts were traded.

10

(c) Changes in futures contract prices typically cause changes in the prices of options on those futures.

C.    **CBOT Rough Rice Futures and Options Contracts**

31. One of the futures contracts created by the CBOT and approved by the CFTC is the CBOT rough rice futures contract.

32. Rough rice futures contracts are transacted electronically on the Chicago Mercantile Exchange ("CME") Globex electronic trading platform and also through open outcry on the trading floor of the CBOT.  Open outcry is a method of public auction for making bids and offers in the trading pits of futures exchanges.

33. The size of a CBOT rough rice futures contract is 2,000 hundredweights (or approximately 91 metric tons), and prices are quoted in dollars and cents per hundredweight.

34. CBOT rough rice futures contracts call for settlement by physical delivery.

35. CBOT rough rice futures contracts trade for delivery in the following months: January, March, May, July, September and November.

36. Trading in CBOT rough rice futures contracts terminates the business day prior to the 15th calendar day in the contract month.

37. CBOT rough rice option contracts are the same size as one CBOT rough rice futures contract.

38. Trading in CBOT rough rice serial option contracts terminates on the last Friday which precedes by at least two business days the last business day of the month preceding the option month.

39. Importantly, trading in CBOT rough rice futures and option contracts is subject to the rules and regulations of the CBOT. Such rules and regulations include position limits established by the CBOT and approved by the CFTC.

<u>SUBSTANTIVE ALLEGATIONS</u>

A.      **Manipulation Destroys The Legitimizing Functions of Commodity Futures Trading**

40. Provided that there is no price manipulation, the prices produced by futures contract trading serve three legitimizing functions: (1) price discovery, (2) efficient and fair risk transfer (also known as hedging), and (3) reduction in price volatility. *Cargill, Inc. v. Hardin*, 452 F.2d 1154, 1173 (8th Cir. 1971).

41. But price manipulation destroys all three legitimizing functions of commodity futures trading. *Id.* Indeed, specific price manipulations in the past have even destroyed or greatly impaired various commodity exchanges and specific commodity futures contracts.

42. In commodity futures markets, an artificial price is determined by examining the aggregate forces of supply and demand and searching for any factors which are not a legitimate part of the price equation for a commodity. If a price is affected by a factor that is not legitimate, then "…the resulting price is **necessarily** artificial. Thus, the focus should not be as much on the ultimate price, as on the nature of the factors causing it." [Emphasis supplied]. *In re Indiana Farm Bureau Cooperative Ass'n*, 1982 WL 30249 at *39 (CFTC Dec. 17, 1982) (Stone, J. concurring). At a minimum, illegitimate factors include unlawful conduct.

43. The Manipulator Defendants' repeated violations of the CBOT's position limits were blatantly unlawful. Each such unlawful position constituted illegitimate trades and an illegitimate position that were being injected into the supply-demand equation for prices of CBOT rough rice futures and option contracts. These illegitimate factors necessarily caused

artificial prices for CBOT rough rice futures and option contracts during the Class Period. The Manipulator Defendants were experienced market participants, large traders, and very well knew and specifically intended that their unlawful trades and positions would have these artificial effects on prices.

### B.      <u>Position Limits Are Intended to Prevent Manipulation</u>

44. A position limit is the maximum position, either net long or net short, in one commodity future (or option) or in all futures (or options) of one commodity combined that may be held or controlled by one person (or two or more persons acting pursuant to an express or implied agreement) as prescribed by an exchange and/or by the CFTC.

45. According to the CEA, position limits are designed to "…reduce the potential threat of market manipulation or congestion…" See 7 U.S.C. 7(d)(5).

46. The CBOT rough rice futures market is not a large futures market, is relatively "illiquid," and is a relatively "thin depth" market. That is, both the amount of actual trading is low and the amount of potential trading is low in these markets. Accordingly, relative to many other futures contracts, the CBOT rough rice futures contract was extremely susceptible to a manipulation.

47. CBOT rough rice futures contracts were subject to the following position limits established by the CBOT and approved by the CFTC:

     a.    **<u>Single Month (Other Than Spot Month)</u>**: Prior to April 14, 2008 the speculative limit for any month other than the spot month (*i.e.*, the nearest delivery month on a futures contract) was 1,000 contracts.

     b.    **<u>All Months</u>**: Prior to April 14, 2008, the speculative limit for all contract months combined was 1,000 contracts.

13

    c. **Spot Month / July Contract Step-Down**: Throughout the Class Period, the speculative limit for the spot month contract was 600 contracts with a July contract step-down limit of 200 contracts during the final five trading days of the July contract.

48. The CBOT rules in effect throughout the Class Period provided that such speculative position limits "…shall apply to positions held by two or more persons acting pursuant to an expressed or implied agreement or understanding, the same as if the positions were held by, or the trading of the positions were done by, a single person." CFTC Order p. 4.

**C. The Repeated Violations By Defendants Daniels, DTC and Taylor of CBOT Speculative Position Limits**

49. During the Class Period, the Manipulator Defendants traded CBOT rough rice futures contracts pursuant to express and implied agreements such that CBOT rules required the Manipulator Defendants' positions to be aggregated for purposes of speculative position limits.

50. However, the Manipulator Defendants were able to repeatedly violate CBOT position limits because they concealed the actual ownership and control of their rough rice futures from the CBOT.

51. The CFTC found that the Manipulator Defendants' rough rice futures positions, when properly aggregated, exceeded the following CBOT speculative position limits during the Class Period:

    a. On at least **forty-two** trading days, the Manipulator Defendants violated the CBOT's rough rice all-contract month speculative limit of 1,000 contracts;

b.  On at least **thirty-eight** trading days, the Manipulator Defendants violated the CBOT's rough rice single contract month speculative limit of 1,000 contracts; and

c.  On at least **three of the last five** trading days of the July 2008 rough rice futures contract, the Manipulator Defendants violated the CBOT's step-down speculative limit of 200 contracts in the July 2008 rough rice futures contract.

**D.  Defendants' Repeated Violations of CBOT Speculative Position Limits Were Not Only Illegitimate Parts of the Supply-Demand Equation for the Prices of CBOT Rough Rice Futures and Options But Also Were Frequent, And Even Provided Defendants With Positions That Were Dominant In Size**

52.  The Manipulator Defendants' foregoing repeated violations of speculative position limits were not legitimate parts of the supply-demand equation for the price of the CBOT rough rice futures contract.  Rather, they were unlawful and illegitimate parts that were improperly injected into such equation.

53.  Therefore, the resulting prices of CBOT rough rice futures and option contracts were necessarily artificial by at least the amounts of impact on prices caused by the unlawful portion of Defendants' trades and positions.

54.  (a) Moreover, Defendants' artificial effects on prices were very frequent in that they occurred, according to the CFTC, eighty\-three times.

(b) Not only were the Manipulator Defendants' violations and resulting artificial impact frequent. The Manipulator Defendants' violations of the speculative position limits of CBOT rough rice futures contracts also resulted in Defendants obtaining a dominant position in various contracts, including in the thinly traded July 2008 rough rice futures contract.  This included the following:

15

| Date | Open Interest of July 2008 Contract | Defendants' *Minimum* Percentage of Open Interest in July 2008 Contract |
|---|---|---|
| | | |
| July 8, 2008 | 599 | 33.3% |
| July 9, 2008 | 430 | 46.5% |
| July 10, 2008 | 264 | 75.8% |

(c) Each artificial price caused by such Defendants was disseminated to market participants and caused artificial fluctuations of prices. For example, the rough rice futures contract acts as a price beacon to market participants to guide their decisions to buy or sell.

(d) In the foregoing and many other ways, such Defendants' frequent violations had concussive, direct and indirect artificial effects on prices and deprived Plaintiffs and Class members of a lawfully operating market. For example:

i. One of the evils of violations of position limits is that such violations cause undue and unwarranted fluctuations in the levels of prices. Over the forty-three month period beginning with the first business day in 2005 and continuing through the end of the Class Period (July 31, 2008), the twenty-one largest increases in the levels of prices and the twelve largest decreases in the levels of prices occurred during the Class Period when Defendants' eighty-three violations of the position limits were causing artificial and unwarranted fluctuations in the levels of prices.

ii. As is alleged elsewhere herein, Defendants' repeated violations not only caused variations in the levels of prices but also twisted the relationship between the prices of the nearby futures contracts and those of more deferred contracts. The difference between the price of one futures contract and that of another futures contract is usually referred to as the "spread." Over the forty-three month period beginning with the first business day in 2005 and continuing through the end of the Class Period (July 31, 2008), the ten largest increases in spread prices and the twenty-two largest decreases in spread prices occurred during the Class Period

16

when Defendants' eighty-three violations of the position limits were causing artificial and unwarranted fluctuations in the levels of prices. Also, for the forty-three month period beginning with the first business day in 2005 and continuing through the end of the Class Period (July 31, 2008), the forty-two largest negative spread prices occurred during the Class Period when Defendants' eighty-three position limit violations were causing unwarranted fluctuations in prices.

        iii.     The rough rice futures price deviated significantly from the cash market price for rough rice as the Class Period progressed.

        iv.     The relationship of one futures contract month to another futures contract month (the "spread" between the prices of the nearby futures expiration and the prices of later expiring contract months) fluctuated artificially during the Class Period.

        v.     For example, during three trading days during which Defendants had a dominant position in the July 2008 contract, the spread between the July 2008 contract and the September 2008 contract increased by more than 54% from $1.62 on July 8, 2008 to $2.55 on July 10, 2008.

        vi.     These deviations in the spreads were highly unusual and are a strong indication of price artificiality occurring at the very time that Defendants' dominant positions, in violation of the position limits, were affecting market prices.

        vii.     Similarly, the growing discrepancy between futures and cash market prices also is an indication of price artificiality. This deviation also progressed as Defendants' repeated violations of the rules designed to prevent manipulation grew and took their toll on the market during the Class Period.

**E. The Manipulator Defendants' Intent To Manipulate Is Reflected In The Concealment of Their Violations From The CBOT**

55. In addition to the Manipulator Defendants' repeated violations of the CBOT's position limits, the CFTC further found that such Defendants willfully concealed from the CBOT the actual ownership and control of accounts that held rough rice positions.  CFTC Order p. 3.

56. (a) For example, the CFTC found that Defendants Daniels, Taylor and DTG concealed:  "Daniels' ownership interest in a trading account in Taylor's name; Taylor's trading of an account in the name of Daniels; and the number of rough rice futures contracts actually held by Daniels, Taylor and DTG on numerous trading days."  *Id*.  On information and belief, Defendants Swanson and Global (the "Aider and Abettor Defendants") both (a) had no power of attorney or other disclosed authorization that would permit Taylor to trade in the account at Global in Defendant Daniels' name, and (b) did have knowledge or were willfully blind to the fact that Defendant Daniels had an ownership interest in an account in Defendant Taylor's name.

(b) Because the purpose of position limits is to prevent price manipulation, it is reasonable to infer and Plaintiffs do allege that, in concealing from the CBOT their true ownership and their frequent and large violations of the position limits, Defendants Taylor, Daniels and DTG specifically intended to impact and manipulate prices.

57. (a) The CFTC also found that Defendants Global and Swanson failed to diligently supervise their employees and the trading of Defendants Daniels, Taylor and DTG, and thereby allowed the concealment of the speculative limit violations to occur.  *Id*.  In allowing eighty-three violations of the rules designed to prevent price manipulation, Defendants Global and Swanson provided highly unusual and very material assistance to the intentional artificial impact on prices that Defendants Taylor, Daniels and DTG caused.  As market professionals, Defendants Swanson and Global knew very well that operating with non-existent or extremely

substandard "compliance" procedures regarding rules designed to prevent manipulation, could directly result in manipulation and constitute or provide the foregoing highly unusual assistance to manipulation.

(b) The facts that came to the attention of Defendants Swanson and Global strongly suggested and Plaintiffs do allege that Swanson and Global knowingly violated the most basic customs and standards of the industry in order to provide highly unusual assistance to Defendants DTG, Daniels, and Taylor.

(c) In furtherance of the manipulation, Defendants Global and Swanson not only failed to diligently supervise the handling of the trading accounts of Daniels, Taylor and DTG by Global's partners, officers, employees, and agents. Defendants Global and Swanson knowingly failed to observe the most basic rules in commodity futures trading. For example, Defendants Global and Swanson violated the most basic requirements of the commodity futures market by allowing an individual (Defendant Taylor) to place trades for an account in another's name (Defendant Daniels), without a power of attorney authorization.

(d) This practice of placing trades in the account of another was a large red flag that Defendants Taylor, DTG, and Daniels were under common control. The ownership interest of Daniels in Taylor's account was another red flag. Despite the Aider and Abettor Defendants' reporting responsibilities, they never reported the Manipulator Defendants' accounts as being jointly held.

(e) For these further reasons, Defendants Swanson and Global knowingly and intentionally assisted and furthered both the position limit violations and the resulting artificial impact on prices. The Aider and Abettor Defendants did so through highly unusual conduct constituting violations of the most basic customs and standards of the industry. Defendants

19

Swanson and Global also (1) allowed trading accounts introduced by Defendant Global and traded by one of its officers to repeatedly exceed the applicable CBOT rice position limits, and (2) allowed Defendants Daniels, Taylor and DTG to add rice positions to accounts that should have been aggregated after positions in these accounts had exceeded the applicable rice position limits.

### F. Defendants Agreed to Substantial Relief In Order To Settle the Charges Against Them

58. In order to settle the charges against them, Defendants agreed to the following substantial civil monetary penalties and extensive injunctive relief:

    a. Defendants Daniels, Taylor and DTG agreed to pay a $2,000,000 civil monetary penalty;

    b. Defendants Global and Swanson agreed to pay a $200,000 civil monetary penalty;

    c. Defendants Daniels and DTG agreed to cease trading in rough rice futures or option contracts for eleven months;

    d. Defendant Taylor agreed to cease trading in any commodity for eleven months;

    e. Defendant Global agreed to substantial remedial relief, including implementing strengthened compliance procedures; and

    f. Each Defendant agreed to cease and desist from violating the CEA and CBOT rules and regulations they violated. See CFTC Order pp. 5-8.

## CLASS ALLEGATIONS

59. Plaintiffs bring this action on behalf of themselves, and all others similarly situated, pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of the following Class:

> All persons or entities that purchased or sold, during the period from at least October 1, 2007 through at least July 31, 2008 ("Class Period"), a CBOT rough rice futures or option contract.[2] Excluded from the Class are the Defendants and any parent, subsidiary, affiliate, or agent of any Defendant.

60. The Class is so numerous that joinder of all members is impracticable. Due to the nature of the commerce involved, the members of the Class are geographically dispersed throughout the United States. The number and identity of Class members is unknown to Plaintiffs, but can be ascertained from readily available information. Plaintiffs believe that there are hundreds or more members of the Class.

61. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a. Whether Defendants manipulated CBOT rough rice futures or option contracts in violation of the CEA;

b. Whether such manipulation caused CBOT rough rice futures or option contracts to be artificial;

c. Whether such manipulation caused cognizable legal injury under the CEA;

d. Whether such injury or the fact or extent of such artificiality may be established by common, class-wide means, including, for example, by regression analysis, econometric formula, or other economic tests; and

e. The operative time period and extent of Defendants' foregoing violations.

---

[2] Plaintiffs reserve their rights to change the definition of the Class in the class motion or otherwise.

62. Plaintiffs' claims are typical of the claims of the other members of the Class they seek to represent. Plaintiffs and members of the Class were injured by the same unitary course of alleged manipulative conduct and make the same legal claim.

63. Plaintiffs will fully and adequately protect the interests of all members of the Class. Plaintiffs have retained counsel experienced in commodity futures manipulation class actions. Plaintiffs have no interests which are adverse to or in conflict with other members of the Class.

64. The questions of law and fact common to the members of the Class predominate over any questions which may affect only individual members.

65. A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all Class members is impracticable. The prosecution of separate actions by individual members of the Class would impose heavy burdens upon the courts, and would create a risk of inconsistent or varying adjudications of the questions of law and fact common to the Class. A class action, on the other hand, would achieve substantial economies of time, effort, and expense, and would assure uniformity of decision with respect to persons similarly situated without sacrificing procedural fairness or bringing about other undesirable results.

66. The interest of members of the Class in individually controlling the prosecution of separate actions is theoretical rather than practical. The Class has a high degree of cohesion, and prosecution of the action through representatives would be unobjectionable. The damages suffered by the individual Class members may be relatively small. Therefore, the expense and burden of individual litigation make it virtually impossible for them to redress the wrongs done to them. Plaintiffs anticipate no difficulty in the management of this action as a class action.

**FRAUDULENT CONCEALMENT AND EQUITABLE TOLLING**

67. By its very nature, the unlawful activity alleged herein that Defendants engaged in was self-concealing. Further, Defendants took specific steps to conceal same. See ¶¶54-56 *supra* (detailing the steps Defendants took to conceal their actions from the CBOT).

68. Plaintiffs neither knew of, nor, in the exercise of reasonable diligence, could have known of the violations on which their claims are based until approximately three years and four months **after** the violations began.

69. The running of any statutes of limitations has been suspended with respect to any claims which Plaintiffs and other members of the Class have. This is by virtue of the federal doctrines of fraudulent concealment and equitable tolling. As a result, all statutes of limitations otherwise applicable to the allegations herein have been tolled until January 26, 2011 (*i.e.*, the date of the CFTC Order).

## COUNT I

**(For Manipulation In Violation of The Commodity Exchange Act, 7 U.S.C. §1 *et seq*.)**

**AGAINST DEFENDANTS DTG, DANIELS AND TAYLOR**

70. Plaintiffs re-allege and incorporate all the foregoing allegations of this Complaint with the same force and effect as if fully restated herein.

71. Defendants DTG, Daniels and Taylor, through their acts alleged herein, from at least October 1, 2007 through July 31, 2008, specifically intended to and did cause unlawful and artificial prices of CBOT rough rice futures and option contracts in violation the CEA, 7 U.S.C. §1, *et seq.*

72. (a) In all the circumstances previously alleged, Defendants Daniels, Taylor and DTG had ample ability to cause and did cause artificial prices by injecting substantial

illegitimate and unlawful factors into the supply-demand equation for rough rice futures and option contract prices.

(b)     For example, on the three days in July when Defendants' minimum share of the open interest may be inferred from the CFTC Order, both the levels of prices and the relationship between prices were artificially impacted.  See *e.g.*, ¶54 *supra.*  That is, Defendants' manipulation, during July 8 – 10, 2008, both changed the levels of prices and twisted the relationship between prices of different futures contracts.

(c)     However, the exact days of Defendants' eighty other violations may not be inferred from the CFTC Order.  Therefore, further allegations of specific violations and specific effects may not be made now.

73. Plaintiffs and other persons who purchased CBOT rough rice futures and option contracts during the Class Period (a) transacted at the resulting artificial and unlawful prices and (b) were further legally injured in that they transacted in an artificial and manipulated market operating under the artificial price signals caused by Defendants.

74. As a direct result, Plaintiffs and members of the Class who purchased CBOT futures and option contracts during the Class Period were injured and are entitled to their actual damages.

## COUNT II

### (For Principal-Agent Liability In Violation of The Commodity Exchange Act, 7 U.S.C. §1 *et seq*.)

### AGAINST DEFENDANTS DTG, DANIELS AND TAYLOR

75. Plaintiffs re-allege and incorporate all the foregoing allegations of this Complaint with the same force and effect as if fully restated herein.

76. Under Section 2(a)(1)(B) of the CEA, 7 U.S.C. §2(a)(1)(B), each of the Manipulator Defendants is an agent and acted on behalf of the other Manipulator Defendants. Each Manipulator Defendant is liable for the acts of the other Manipulator Defendants.

77. Plaintiffs and members of the Class are each entitled to actual damages for the violations alleged herein.

## COUNT III

**(For Aiding and Abetting Manipulation In Violation of The Commodity Exchange Act, 7 U.S.C. §1 *et seq.*)**

**AGAINST ALL DEFENDANTS**

78. Plaintiffs re-allege and incorporate all the foregoing allegations of this Complaint with the same force and effect as if fully restated herein.

79. The Manipulator Defendants also each knowingly aided and abetted the violations of the CEA alleged herein. Further, each Manipulator Defendant counseled, induced and/or procured the violations by the other Manipulator Defendants.

80. Under Section 13c(a) of the CEA, 7 U.S.C. §13, Defendants are liable for willfully intending to assist the manipulation.

81. As previously alleged, Defendants Swanson and Global knowingly provided highly unusual and material assistance to conduct that they knew or had very strong reason to know was inherently manipulative, unlawfully moving prices, and specifically intended to move prices. It is reasonable to infer, and Plaintiffs do allege, that Defendants Swanson and Global intended to and did assist such manipulative conduct and manipulation.

82. Plaintiffs and members of the Class are each entitled to actual damages for the violations alleged herein.

25

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs pray for relief as follows:

A.  for a declaratory judgment that the Manipulator Defendants manipulated CBOT

rough rice futures and option contracts in violation of the CEA Section 9(a), 7

U.S.C. Section 13(b);

B.  for a declaratory judgment that the Manipulator Defendants are also liable for

such manipulation under Section 2(a)(1) of the CEA;

C.  for a declaratory judgment that all Defendants are liable for aiding and abetting

such manipulation under Section 13c(a) of the CEA, 7 U.S.C. Section 13;

D.  for an order certifying the claims as a class action on behalf of the Class;

E.  for a judgment awarding Plaintiffs and the Class damages against Defendants for

Defendants' violations of the CEA together with prejudgment interest at the

maximum rate allowable by law; and

F.  for such other and further relief as the Court may deem just and proper.

## DEMAND FOR JURY

Pursuant to Federal Rule of Civil Procedure 38(b) and otherwise, Plaintiffs demand a trial

by jury.

Dated: June 7, 2011

Plaintiffs
By:

Christopher Lovell
Christopher M. McGrath
**LOVELL STEWART HALEBIAN JACOBSON LLP**
61 Broadway, Suite 504
New York, New York 10006
Telephone:     (212) 608-1900
Facsimile:      (212) 719-4775

*/s/ Vincent Briganti*
Vincent Briganti
Geoff Horn
**LOWEY DANNENBERG COHEN & HART, P.C.**
One North Broadway
White Plains, New York 10601
Telephone:     (914) 997-0500
Facsimile:     (914) 997-0035

***Lead Counsel for Plaintiffs and the Proposed Class***

*/s/ Marvin A. Miller*
Marvin A. Miller
Matthew E. Van Tine
**MILLER LAW LLC**
115 S. LaSalle Street, Suite 2910
Chicago, Illinois 60603
Telephone:     (312) 332-3400

Michael D. Hausfeld
William P. Butterfield
Ralph J. Bunche
**HAUSFELD LLP**
1700 K Street, NW, Suite 650
Washington, DC 20006
Telephone:     (202) 540-7200
Facsimile:     (202) 540-7201

Elizabeth A. Fegan
**HAGENS BERGMAN SOBOL SHAPIRO LLP**
1144 West Lake Street, Suite 400
Oak Park, Illinois 60301
Telephone:     (708) 628-4960
Facsimile:     (708) 776-4950

Lee Albert
Benjamin D. Bianco
**MURRAY, FRANK & SAILER LLP**
275 Madison Avenue, Suite 801
New York, New York  10016
Telephone:     (212) 682-1818

***Additional Counsel for the Proposed Class***