

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

IN RE: ROUGH RICE COMMODITY ) Case No. 11 C 618
LITIGATION )
) Judge John W. Darrah

## SECOND AMEDED MEMORANDUM OPINION AND ORDER

Plaintiffs Gregory Galan, Jeffrey Laydon, and The Rice Corporation ("TRC") have filed a Consolidated Amended Class Action Complaint against Defendants Andrew Daniels; Edward Taylor; Robert Courson; Glenn Swanson; Global Asset Advisors, LLC d/b/a Daniels Trading ("Global Asset"); and Daniels Trading Group, LLC ("DTG"). The Consolidated Amended Class Action Complaint alleges violations of the Commodity Exchange Act, 7 U.S.C. § 1, *et seq.* ("CEA"), arising from an alleged scheme to manipulate the price of rice futures contracts from October 1, 2007 through July 31, 2008 (the "Class Period"). Before the Court are two Motions to Dismiss: one filed by Courson and another filed by all other Defendants – Daniels, Taylor, Swanson, Global Asset, and DTG.[1] On February 9, 2012, the Court previously granted without prejudice Defendants' Motion to Dismiss Plaintiffs' Consolidated Complaint (the "2/19/12 Order").

---

[1] These Defendants will be referred to as "Defendants" for the purposes of their Motion, and any arguments made by Courson will be referred to as such.

## BACKGROUND

*Parties*

The following facts are drawn from Plaintiffs' Amended Consolidated Complaint, which are accepted as true for purposes of the Motion to Dismiss. *See Reger Dev., LLC v. Nat'l City Bank*, 592 F.3d 759, 763 (7th Cir. 2010).

Galan entered into two Chicago Board of Trade ("CBOT") transactions during the Class Period. (Am. Compl. ¶ 22(a).) First, on November 30, 2007, Galan sold three January 2008 Chicago Board of Trade rough rice futures contracts. (*Id.*) On December 7, 2007, Galan purchased three January 2008 CBOT rough rice futures contracts. (*Id.*) Galan lost $2,700 on this transaction. Second, on March 20, 2008, Galan sold one May 2008 rough rice futures contract. (*Id.*) On April 15, 2008, Galan purchased one May 2008 CBOT rough rice futures contract. (*Id.*) Galan lost $8,660 on the foregoing transactions. (*Id.*)

Laydon entered into one CBOT purchase transaction during the Class Period. (*Id.* ¶ 22(b).) On October 11, 2007, Laydon purchased ten January 2008 CBOT rough rice put options. (*Id.*) Those options expired worthless on December 21, 2007. (*Id.*) Laydon lost $1,000 on this transaction. (*Id.*)

TRC is a privately-held, full-servicing trading and processing corporation. TRC "paid the artificially high prices caused by Defendants on July 8, 2008, to liquidate/cover a short position of six November 2008 rice futures for a loss in excess of $40,000, and on July 15, 2008, to liquidate a short position of four November 2008 rice futures for a loss in excess of $25,000." (*Id.* ¶ 23(c).)

2

Daniels is the founder and Chief Executive Officer of Global Asset, which is registered with the Commodities Futures Trading Commission ("CFTC") as an introducing commodity broker. (*Id.* ¶ 23.) Daniels is also a manager of DTG, a trading company. (*Id.*) Taylor is not registered with the CFTC and has a 0.02 percent membership interest in DTG. (*Id.*) Courson has a 49.98 percent interest in DTG. (*Id.* ¶ 25.) Courson was the member and manager of DTG; as a member, Courson received updates regarding DTG's trading strategies in the CBOT rice futures and rice cash markets and monthly profit and loss statements. (*Id.*) Swanson is the President and Chief Operating Officer of Global Asset. (*Id.* ¶ 26.)

*Commodity Futures Contracts*

CBOT is designated by the CFTC as a board of trade. (*Id.* ¶ 30.) The CBOT applies to the CFTC for permission to trade each commodity in which the CBOT offers a contract. (*Id.*) A commodity futures contract is a standardized bilateral executory agreement for the purchase and sale of a particular commodity. (*Id.* ¶ 32.) The sellers, referred to as "shorts," are one-half of the bilateral futures contracts, and the buyers are the other one-half and are referred to as "longs." (*Id.*) One of the futures contracts created by the CBOT and approved by the CFTC is the CBOT rough rice futures contract. (*Id.* ¶ 40.) Rough rice futures contracts are transacted electronically on the Chicago Mercantile Exchange ("CME") Globex electronic trading platform and also through open outcry on the trading floor of the CBOT. (*Id.* ¶ 41.)

*Plaintiffs' Claims*

In Count I, Plaintiffs allege that all Defendants, except Global Asset, violated the prohibition of manipulation in Section 9(a) of the CEA by manipulating rice futures and options prices. Count II claims the same conduct but alleges that Daniels, Taylor, and DTG are each responsible for the acts of the others and that Global is responsible for the acts of Swanson, based on principal-agent liability under section 2(a)(1)(B) of the CEA. 7 U.S.C. § 2(a)(1)(B). Count III claims that all Defendants are liable for aiding and abetting the manipulation under section 13(a) of the CEA, 7 U.S.C § 13c(a). The Amended Complaint contains 201 paragraphs, many of which contain several sub-paragraphs. The following are certain specific allegations regarding Plaintiffs' claims.

From early October 2007 through July 2008, Defendants manipulated the rice futures market by taking large positions. (*Id.* ¶ 1.) CBOT rough rice futures contracts were subject to the position limits[2] established by the CBOT and approved by the CFTC. (*Id.* ¶ 47.) Prior to April 14, 2008, the speculative limit for any month other than the spot month[3] was 1,000 contracts. (*Id.* ¶ 62(a).) Prior to April 14, 2008, the speculative limit for all contract months combined was 1,000 contracts. (*Id.* ¶ 62(b).) Throughout the proposed class period, the speculative limit for the spot-month contract was 600

---

[2] "Position limits" refers to "various CBOT rules limiting the size of the position that could lawfully be held." (*Id.* ¶ 6.)

[3] "Spot month" refers to the "nearest delivery month on a futures contract." (*Id.* ¶ 62.)

contracts, with a July contract step-down limit[4] of 200 contracts during the final five trading days of the July contract. (*Id* ¶ 62(c).)

On October 4, 2007, "accounts owned or controlled by" Daniels and DTG held an aggregate position of 1,068 net long CBOT rough rice futures contracts in the November 2007 CBOT rough rice contract, in violation of the CBOT's single-month position limit of 1,000 contracts. (*Id.* ¶ 72.) On October 11, 2007, and October 29, 2007, accounts owned or controlled by Daniels held a position in violation of the CBOT's all-month position limit of 1,000 contracts. (*Id.* ¶ 77, 86.)

Throughout October 2007 and November 2007, and contemporaneous with the Defendants' purchase of large net long positions in CBOT rough rice futures contracts, Defendants made large purchases of warehouse rough rice receipts in the cash market. (*Id.* ¶ 88.) These purchases enabled the Defendants to gain control over large quantities of rough rice warehouse receipts available for delivery against the CBOT rough rice futures contract. (*Id.*) Defendants' cash purchases added to pressure on CBOT rice futures and option prices and on market participants, holding short positions in such contracts. (*Id.* ¶ 119.) Furthermore, Defendants failed to liquidate and take deliveries on their CBOT rice futures long positions, and doing so uneconomically when CBOT rice futures prices were higher than cash market prices. (*Id.* ¶ 2.)

"Over the forty-three month period beginning with the first business day in 2005 and continuing through the end of the Class Period (July 31, 2008), the twenty-one

---

[4] The terms "large positions," "speculative limit," and "step-down limit" are terms used in allegations in Plaintiffs' Amended Complaint. However, Plaintiffs do not define these terms in their Complaint.

largest increases in the levels of prices and the twelve largest decreases in the levels of prices occurred during the Class Period when Defendants' eighty-three violations of the position limits were causing artificial and unwarranted fluctuations in the levels of prices." (*Id.* ¶ 139.)

## LEGAL STANDARD

A motion under Rule 12(b)(6) challenges the sufficiency of the complaint. *Christensen v. Cnty. of Boone*, 483 F.3d 454, 458 (7th Cir. 2007). Under the federal notice pleading standards, "a plaintiff's complaint need only provide a short and plain statement of the claim showing that the pleader is entitled to relief, sufficient to provide the defendant with fair notice of the claim and its basis." *Tamayo v. Blagojevich*, 526 F.3d 1074, 1081 (7th Cir. 2008) (internal quotations omitted). When considering a motion to dismiss under Rule 12(b)(6), the complaint is construed in the light most favorable to the plaintiff; all well-pleaded factual allegations are accepted as true, and all reasonable inferences are construed in the plaintiff's favor. *Id.* However, a complaint must allege "enough facts to state a claim to relief that is plausible on its face" to survive a motion to dismiss. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 547 (2007) (*Twombly*). For a claim to have facial plausibility, a plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009) (*Iqbal*). Thus, "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* Further, the amount of factual allegations required to

state a plausible claim for relief depends on the complexity of the legal theory alleged. *Limestone Dev. Corp. v. Vill. of Lemont*, 520 F.3d 797, 803 (7th Cir. 2008).

## ANALYSIS

### *Defendants' Motion to Dismiss*

Defendants argue that Plaintiffs have failed to state a price-manipulation claim. In Count I, Plaintiffs bring a manipulation claim against Daniels, Taylor, DTG, Swanson, and Courson. Although Plaintiffs do not specifically cite Section 9(a) of the CEA, this provision logically applies to Plaintiffs' allegations. To bring a claim under Section 9(a), a plaintiff must establish that: (1) the defendant had the ability to manipulate market prices; (2) an artificial price existed; (3) the defendant caused the artificial price to exist; and (4) the defendant specifically intended the artificial price to exist. *In re Soybean Futures Litig.*, 892 F. Supp. 1025, 1045 (N.D. Ill. 1995) (*Soybean Futures*). Furthermore, a plaintiff must plead that he has incurred "actual damages." 7 U.S.C. § 25(a)(1).

Plaintiffs concede that their original consolidated complaint "did not allege whether (a) Defendants held long or short positions, (b) CBOT rice futures prices were caused to be artificially high or low, and (c) very much else beyond the CFTC Order." (Resp. at 1.) Plaintiffs have added new allegations regarding their price-manipulation claim that raise "a reasonable expectation that discovery will reveal evidence" of each element of a manipulation claim. *Twombly*, 550 U.S. at 556; 5B Wright, et al., *Federal Practice and Procedure* § 1357 ("All federal courts are in agreement that the burden is on the moving party to prove that no legally cognizable claim for relief exists.").

Defendants also argue that Plaintiffs have failed to plead allegations against Swanson sufficient to establish he is a primary violator. As discussed below, Plaintiffs have also brought a claim against Swanson and Global Asset for aiding and abetting manipulation. Plaintiffs do not respond to this argument. The Amended Complaint does not contain any allegations that would support Swanson's ability to manipulate the prices of futures contracts. Accordingly, Swanson is dismissed as a Defendant to Count I.

Plaintiffs have alleged that the remaining Defendants had the ability to manipulate prices. In their original Complaint, Plaintiffs attempted to satisfy this first element of a manipulation claim by reciting this element as a legal conclusion. (2/19/12 Order at 11.) *Twombly*, 550 U.S. at 555 (holding that while detailed factual allegations are not needed, a "formulaic recitation of a cause of action's elements will not do."). Plaintiffs did include one allegation that the Court construed as factual; however, the allegation related only to Defendants' obtaining a dominant position in the July 2008 rough rice futures market. Because Plaintiffs' allegations indicated they did not trade July 2008 contracts, the Court held Plaintiffs could not satisfy this first element. (2/19/12 Order at 12.)

In their Amended Complaint, when read in its entirety, Plaintiffs plead allegations that reasonably support an inference that there was continuing manipulation by Defendants that affected the price of rough rice futures contracts from October 2007 through July 2008. Furthermore, Paintiffs added TRC as a Plaintiff, which purchased July 2008 contracts. Plaintiffs now allege that by early 2007, Defendants began purchasing physical rice in the cash market in order to reduce the amount of rice available to deliver in satisfaction of CBOT rice futures contracts. (*Id.* ¶¶ 5, 80-85.)

8

Thus, Plaintiffs allege, that by purchasing physical rice while also holding long positions in rice futures contracts, Defendants caused those holding short positions to pay higher prices. (*See id.* ¶ 5.) Plaintiffs have plausibly alleged that Defendants' positions, coupled with their cash purchase, had the ability to inflate CBOT rice futures contract prices from October 2007 forward. (*See* Am. Compl. ¶¶ 67-99.)

Plaintiffs have plausibly alleged that an artificial price existed. Based on Plaintiffs' allegations above that Defendants inflated demand while artificially reducing supply, Plaintiffs have plausibly alleged that the prices of rough rice futures contracts were artificial.

Plaintiffs have plausibly alleged that Defendants specifically intended the artificial price to exist. Plaintiffs have added allegations to their Amended Complaint, which includes allegations that could give rise to an inference of manipulative intent. For example, Defendants bought up cash-market rice in late October and November; from this, it could be inferred that Defendants intended to increase CBOT rice futures contract prices. (*See id.* ¶ 85.) In addition, from November 2007 onward, Plaintiffs allege that Defendants failed to liquidate and take deliveries on their CBOT rice futures long positions, which, in the face of rice futures prices that were higher than cash prices, gives rise to an inference of manipulative intent. (*See id.* ¶¶ 111, 117.)

Finally, Plaintiffs must allege that they sustained actual damages. *See* 7 U.S.C. § 25(a)(1). Defendants argue that the loss-causation principle embodied in *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 346 (2005) (*Dura*), applies to Plaintiffs' price manipulation claim. This issue need not be decided. As the court in *In re Energy*

9

*Transfer Partners Natural Gas Litig.*, No. 07 Civ. 3349(KPE), 2009 WL 2633781, *11 (S.D. Tex. Aug. 29, 2009) (*In re Energy Transfer*), noted, "it is difficult for the Court to conclude that, regardless of whether it is proper to import wholesale the reasoning of *Dura* to the CEA, [Galan and Laydon, in this case] have alleged damages from their purchase of futures contract that plausibly relate to Defendants' conduct." *Id.*

Defendants argue that Plaintiffs have failed to plead actual damages. In response, Plaintiffs argue as follows:

> Plaintiffs plausibly allege that Defendants inflated prices of the November 2008 CBOT rice futures contract in that Defendants engaged in an extreme form of manipulation during and until July 15 2008; that this inflated or held up the July and November 2008 rice futures contracts prices during the first part of July; but that the November 2008 contract fell from $18.37 on July 15 (at the end of Defendants' manipulation) to $16.66 on August 1, 2008; while the July contract fell from $17.80 to $16.58 from July 15 to the end of July.

(Resp. at 13.)

TRC did trade rice futures in July 2008, and this allegation is sufficient to plead actual damages. However, neither Galan nor Laydon traded July 2008 rice futures contracts. Plaintiffs do not plead any specific proximate causation allegations regarding Galan's or Laydon's trading. The failure to plead that Galan and Laydon sustained alleged damages is fatal to their Complaint regarding Galan and Laydon.

In sum, Galan's and Laydon's claims are dismissed, and Swanson is dismissed as a Defendant from Count I. Because Swanson has been dismissed, Global Asset is dismissed from Count II, which is a principal-agent liability claim, in which Plaintiffs

allege that "Swanson acted on behalf of Global." (Am. Compl. ¶ 194.) These dismissals are without prejudice.

Defendants argue that Plaintiffs have failed to state a claim against Swanson and Global Asset. In Count III, Plaintiffs bring a claim for aiding and abetting manipulation in violation of 7 U.S.C. § 13 against all Defendants. 7 U.S.C § 13c(a) creates liability for "[a]ny person . . . who willfully aids, abets, counsels, commands, induces, or procures the commission of a violation of any provisions of this chapter." To state a claim for aiding and abetting liability under § 13c(a) of the CEA, a plaintiff must allege that the defendant: "(1) had knowledge of the principal's intent to commit a violation of the CEA; (2) had the intent to further that violation; and (3) committed some act in furtherance of the principal's objective." *766347 Ontario, Ltd. v. Zurich Capital Mkts., Inc.*, 274 F. Supp. 2d 926, 935 (N.D. Ill. 2003) (citing *Damato v. Hermanson*, 153 F.3d 464, 473 (7th Cir. 1998) (*Damato*).

Defendants contest only the third element of Plaintiffs' claim against Global Asset and Swanson, arguing that Plaintiffs have not alleged that Global Asset or Swanson committed an affirmative act. In the 2/19/12 Order, Plaintiffs' Count III was dismissed because Plaintiffs had not stated an underlying claim of price manipulation. But the Court noted that even so, Plaintiffs would have failed to state an aiding and abetting claim against Global Asset and Swanson because their allegations of "omissions or passive inaction" were insufficient under *Damato*. *Damato*, 153 F.3d at 473 (holding that plaintiff must allege that the defendant "committed some act in furtherance of the principal's objective" to state a claim for aiding and abetting liability under the CEA).

11

Plaintiffs have supplemented their allegations in the Amended Complaint. For example, Plaintiffs allege that Swanson (acting on behalf of Global Asset) advised Courson regarding cashing out his futures contracts. (Am. Compl. ¶ 106.) Therefore, at this stage, Plaintiffs have sufficiently pled "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 663. Defendants' Motion to Dismiss is denied as to Count III.

*Courson's Motion to Strike and Dismiss*

Courson was added as a Defendant to the Amended Complaint. Courson argues that all allegations specific to him should be stricken pursuant to Federal Rule of Civil Procedure 12(f) because they are based on material from the CFTC's underlying investigation. Courson also argues that Plaintiffs fail to state any claim against him pursuant to Rule 12(b)(6). Under Federal Rule of Civil Procedure 12(f), on a motion made prior to a responsive pleading, the court "may order stricken from any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). Motions to strike are a disfavored, drastic remedy. *See, e.g., Custom Vehicles, Inc. v. Forest River, Inc.*, 464 F.3d 725, 726-28 (7th Cir. 2006). "The party moving to strike has the burden of showing that the challenged allegations are so unrelated to plaintiff's claim as to be devoid of merit, unworthy of consideration, and unduly prejudicial." *E & J Gallo Winery v. Morand Bros. Beverage Co.*, 247 F. Supp. 2d 979, 982 (N.D. Ill. 2003) (citation and internal quotation omitted) (*E & J Gallo*).

Courson argues that Plaintiffs' allegations against him are "based on a transcript of a CFTC investigatory deposition, during which he invoked his rights under the 5th and

14th Amendments to the United States Constitution and declined to answer any substantive questions." (Courson Mot. at 5.) Plaintiffs do not deny this. However, they contend that many of the CFTC's questions directed at Courson were captured in emails and other documents produced to the CFTC, which are the basis of Plaintiffs' pending Freedom of Information Act request to the CFTC. Therefore, where Plaintiffs have other evidence of the evidence offered against Courson at his deposition, an adverse inference is not being drawn based on Courson's refusal to testify. (Courson Mot. at 5, citing *Baxter v. Palmigiano*, 425 U.S. 308, 316-18 (1976).) *See also LaSalle Bank Lake View v. Seguban*, 54 F.3d 387, 391 (7th Cir. 1995) ("*Baxter's* concern . . . is that the defendant's silence be weighted *in light of other evidence* rather than leading directly and without more to the conclusion of guilty or liability.") (emphasis in original).

Furthermore, Courson's argument that Plaintiffs are treating Courson's assertion of the Fifth Amendment privilege at his deposition as an "admission" is not persuasive. The Amended Complaint itself is not evidence. In sum, Courson fails to meet his burden under Rule 12(f) of demonstrating that Plaintiffs' allegations "are so unrelated to [P]laintiff's claim as to be devoid of merit, unworthy of consideration, and unduly prejudicial." *E & J Gallo*, 247 F. Supp at 982.

### Count I

Courson argues that Plaintiffs have failed to state a price-manipulation against him because their allegations regarding Courson's ability and intent to influence market prices are conclusory and implausible. Plaintiffs allege only that Courson had the "ample

ability to cause and did cause artificial prices." (Am. Comp. ¶ 190.) This is, however, a bare recital of an element of Plaintiffs' cause of action.

Notably, Plaintiffs' Amended Complaint does not contain any allegations that Courson engaged in any trading himself or that he purchased any cash-market rice. Plaintiffs generally allege that Courson participated in the decision to purchase cash rice and financed DTG's cash rice purchases from October 2007 forward. (*See id.* ¶¶ 5, 70.) But Plaintiffs' underlying theory of Plaintiffs' claim appears to be that Defendants' combination of holding long positions in rough rice futures coupled with purchasing cash rice resulted in higher prices for rough rice futures. However, Plaintiffs' allegations regarding Courson do not plausibly demonstrate that he had the ability to manipulate prices. Therefore, Courson's Motion to Dismiss is granted without prejudice as to Count I.

## Count III

Courson argues that Plaintiffs have failed to plead that Courson engaged in any affirmative actions in furtherance of the alleged price manipulation. Plaintiffs allege that although Courson wanted to withdraw his investment from DTG, Courson was told by Daniels that Courson should not withdraw his investment because it "would have a depressant effect on prices." (*Id.* ¶ 103.) Plaintiffs further allege that "Defendants agreed that Courson would not be cashed out until the expiration of the July 2008 contract on July 14, 2008." (*Id.* ¶ 106.) Courson was cashed out of the July 2008 contract on July 16, 2008. (*Id.* ¶ 121.) Therefore, Plaintiffs have pleaded "factual content that allows the

14

court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 129 S.Ct. at 1949.

## CONCLUSION

For the reasons set forth above, Defendants' Motion to Dismiss is denied in part and granted in part, as follows. Defendants' Motion is denied as to Count I, except as to Defendant Swanson and Plaintiffs Galan and Laydon, who are dismissed without prejudice. Defendants' Motion is granted without prejudice as to Count II with respect to Global Asset. Defendants' Motion is denied as to Count III.

Courson's Motion to Dismiss is granted as to Count I without prejudice and denied as to Count III.

Date: 1-16-13

JOHN W. DARRAH
United States District Court Judge